**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KATHY KALAYCI and MARK RAPPAPORT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>P.F. HARRIS MANUFACTURING COMPANY, LLC and PURPOSEBUILT BRANDS, INC.,<br><br>Defendants. | **JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Kathy Kalayci and Mark Rappaport ("Plaintiffs") bring this putative class action against P.F. Harris Manufacturing Company, LLC ("P.F. Harris") and PurposeBuilt Brands, Inc. ("PurposeBuilt" and, collectively with P.F. Harris, "Defendants"). Plaintiffs' allegations regarding their own experiences are based on personal knowledge. All Plaintiffs' other allegations are based on information and belief, informed by counsel's reasonable investigation.

I. **INTRODUCTION**

1. People care about their pets. Many see cats, dogs, and other animals as part of their family. And, as they would for any family member, many consumers will pay premium prices for goods or services that keep their pets happy, healthy, and safe.

2. Defendants know that. They sell a product called "Safe Melt," which is a specialty salt used to melt ice and snow off entryways, sidewalks, driveways, and yards. To appeal to consumers' significant preference for pet-friendly products, Defendants place a large red graphic on the front of all Safe Melt containers that calls the product "Pet Safe."

- 1 -

3.    But Safe Melt is not safe for pets.  It is composed entirely of magnesium chloride ("MCL"), which is harmful for pets to ingest and dangerous for them to touch.  Safe Melt can cause gastrointestinal irritation, diarrhea, bloody vomiting, respiratory depression, kidney failure, and cardiac arrest to pets that eat it, lick it, or groom their paws after walking over it.  It can also cause chemical burns, cracked paw pads, and painful irritation if it gets embedded in pets' fur or has direct contact with their skin.

4.    Plaintiffs' pets suffered some of these symptoms after being exposed to Safe Melt. Mr. Rappaport's dog, Ruby, experienced kidney failure and died.  And Ms. Kalayci's dog, Malysh, developed painful skin lesions on his legs.

5.    So, why do Defendants call Safe Melt "Pet Safe"?  It is apparently because Safe Melt is "Pet Safe" in one, limited way.  Safe Melt comes in round pellets—not jagged crystals like other ice-melting salts—meaning pets are less likely to cut their paws when walking over it.  But Safe Melt's container does not clarify that the product is only "Pet Safe" in that narrow manner.

6.    That is deceptive.  Surveys show that consumers overwhelmingly believe ice-melting salts advertised as "Pet Safe" are harmless for pets to consume and touch.  Defendants are misleading consumers into believing Safe Melt has characteristics that it lacks, and they are charging a large price premium for the product based off their misrepresentations.

7.    This must stop.  And Defendants must take responsibility for the harm they have caused.  They must pay compensatory and statutory damages to consumers for misleading them and placing their pets in danger.

8.    Plaintiffs seek those damages, and the other forms of relief listed herein, on behalf of themselves and a class of Defendants' similarly-situated former customers.

## II.     PARTIES

### A.     Plaintiffs

*Kathy Kalayci*

9.      Plaintiff Kathy Kalayci is a Wurtsboro, New York resident.  She loves animals and she fosters special-needs dogs.  She currently has four dogs—Dobish, Gaia, Malysh, and Yaren—who she cares for deeply.  She is more than willing to pay premium prices for products that keep her dogs healthy and safe.

10.     Around December 2024, Ms. Kalayci purchased a container of Safe Melt from a store close to Wurtsboro, New York.  She paid approximately $40 for the product, which was a premium compared to other available ice-melting products.

11.     Before Ms. Kalayci purchased Safe Melt, she read the "Pet Safe" graphic on the front of the container.  Ms. Kalayci understood this statement to mean that the product would not harm pets that ingest it or touch it.

12.     This specific promise on the product's container caused Ms. Kalayci to purchase Safe Melt.  She would not have purchased Safe Melt at all, and certainly would not have paid a premium price for the product, had she known that Safe Melt is not "Pet Safe" or that it can cause health problems for animals that ingest it or have contact with it.

13.     After purchasing Safe Melt, Ms. Kalayci sprinkled the product around her home. She subsequently let Yaren and Malysh go outside.

14.     About three days after she first used Safe Melt, Ms. Kalayci noticed that Yaren's paws and the skin around his paws had become red and inflamed.  Shortly after that, she noticed that Malysh had developed what appeared to be painful ulcers or skin lesions on his legs.  The wounds looked like serious red blisters that had popped, and they appeared to cause Malysh significant discomfort.  Malysh—who is a special-needs dog who drags his back legs on the ground

when we walks—had never experienced this type of problem before.

15. Ms. Kalayci did not know the cause of her dogs' health problems at the time. From that point forward, when she let Malysh outside, she had him wear a "drag bag" to protect his legs. A "drag bag" is a specialty bag that keeps special-needs dogs' back legs from contacting the ground while they walk.

16. Ms. Kalayci purchased Safe Melt again in January 2025 and March 2025, each time believing—based on the product's container—that the product was genuinely "Pet Safe." But she noticed that, after each time she purchased and used the product, Yaren's paws suffered irritation. Ms. Kalayci realized that Safe Melt was likely the cause of her dogs' past and current problems. She threw out the remainder of the final container of Safe Melt she had, and she never purchased the product again.

*Mark Rappaport*

17. Mark Rappaport is an Albany, New York resident. Around January 2024, he was shopping in a store in Albany, New York. He saw a container of Safe Melt with a red "Pet Safe" graphic on the front.

18. Mr. Rappaport had a dog named Ruby at the time, and he was willing to pay premiums for products that kept Ruby safe and healthy. Mr. Rappaport believes, and believed at the time, that to say a product is "Pet Safe" means the product will not harm a pet that ingests it.

19. Mr. Rappaport purchased the Safe Melt, paying approximately $40 for it, which was a premium compared to other ice-melting products. Had Mr. Rappaport known that Safe Melt was not truly "Pet Safe," he would not have paid a premium price for it.

20. After purchasing Safe Melt, Mr. Rappaport used it during the winter of 2024, though he did not use the full container. Mr. Rappaport used the leftover product again during the

- 4 -

winter of 2025, sprinkling it around his driveway and sidewalk.

21.     Ruby had access to the outdoors every day.  After Mr. Rappaport used Safe Melt that winter, Mr. Rapport discovered that Ruby had developed kidney disease.  She subsequently died of kidney failure.

### B.     Defendants

22.     Defendant PurposeBuilt Brands, Inc. is a corporation that is incorporated in Delaware.  Its principal place of business is 755 Tri State Parkway, Gurnee, Illinois 60031.  That is the address listed as PurposeBuilt's "primary" address on its LinkedIn page. Ex. 1 (PurposeBuilt LinkedIn Page Screenshots). PurposeBuilt's website also states that the company is "headquartered in Gurnee, Illinois."[1]  And it lists the 755 Tri State Parkway address as "our headquarters," while stating that those headquarters include "a 102,000 sq ft building that is focused on Production and R&D and a 250,000 sq ft, LEED certified building for [PurposeBuilt's] warehouse and administrative offices."[2]

23.     PurposeBuilt's important decision-makers operate out of Illinois, including PurposeBuilt's Executive Chairman of the Board, Christopher Bauder (who also served as PurposeBuilt's Chief Executive Officer from approximately May 2015 through January 2026); PurposeBuilt's Chief Financial Officer and Chief Information Officer, Matthew Sanborn; PurposeBuilt's Vice President of Operations, Tom Macuk; PurposeBuilt's Vice President of Supply Chain, Rob Williams; and PurposeBuilt's Senior Director of Marketing and Head of Seasonal Businesses, Katie Brown, among others.

24.     Defendant P.F. Harris Manufacturing Company, LLC is a limited liability company incorporated in Georgia.  Like PurposeBuilt, P.F. Harris is headquartered at 755 Tri State Parkway,

---

[1] https://purposebuiltbrands.com/company (last visited March 3, 2026).
[2] *Id.*

Gurnee, Illinois 60031.  P.F. Harris's registration page on the Georgia Secretary of State's website lists that address as P.F. Harris's "Principal Office Address."[3]  According to Georgia law, that means the 755 Tri State Parkway address is the location of P.F. Harris's "principal executive offices."[4]  P.F. Harris's connection to that address is also clear because P.F. Harris lists its name and address as "P.F. Harris Manufacturing Company, LLC, 755 Tri-State Parkway, Gurnee, IL 60031" on the product "Safety Data Sheets" that it has created or revised since PurposeBuilt acquired P.F. Harris in September 2024.[5]

25.     As a result of that acquisition, P.F. Harris's important decision-makers operate out of Illinois.  These individuals are the same key decision-makers of PurposeBuilt—who are listed above—among others.  Those decision-makers exercise control over P.F. Harris's employees, assets, operations, and actions, including the operations and actions most relevant to this lawsuit.  By way of example: PurposeBuilt's Senior Director of Marketing and Head of Seasonal Businesses has direct responsibility for the marketing of P.F. Harris products like Safe Melt, which is a seasonal product (her LinkedIn profile, as of March 2026, describes her as a "senior marketing leader operating as a general manager across [a] portfolio" for PurposeBuilt, and it states the "portfolio includes PF Harris").[6]  P.F. Harris does not have a Board of Directors or corporate officers separate from the Board of Directors and corporate officers of PurposeBuilt—the two companies' primary decision-makers are the same people.

26.     PurposeBuilt also hires, employs, pays, and controls other individuals who carry out P.F. Harris's functions.  For example, it hires, employs, pays, and controls the Brand Managers

---

[3] https://ecorp.sos.ga.gov/BusinessSearch (search Control Number 08005765) (last visited March 3, 2026).
[4] Ga. Code § 14-2-140; *see also* Ga. Code Ann. § 14-2-1622.
[5] *See, e.g.*, https://pfharris.com/harris-30-vinegar-128-fl-oz (click on "SDS & Resources Tab," then download PDF named "30% Vinegar SDS"); https://rockmountaincapital.com/purposebuilt-brands-has-officially-acquired-pf-harris (showing acquisition) (last visited March 3, 2026).
[6] https://www.linkedin.com/in/katie-brown-88456043 (last visited March 13, 2026).

who are responsible for "the base business management and growth strategy for the PF Harris brand."[7]  These positions are based out of Gurnee, Illinois.[8]  In fact, PurposeBuilt controls all hiring decisions for P.F. Harris.  The "Careers" page on the P.F. Harris website redirects to a page on PurposeBuilt's website with a list of job openings at PurposeBuilt.[9]

27.     PurposeBuilt also directs, supervises, controls, and approves all key marketing, branding, and sales decisions for P.F. Harris, and it has done so ever since PurposeBuilt acquired P.F. Harris.  For example, PurposeBuilt hires, supervises, and approves the work of agencies that create the advertisements for P.F. Harris's products.[10]  And it does so through PurposeBuilt's high-level corporate officers, like its Chief Marketing Officer.[11]  PurposeBuilt also hires, supervises, and approves the work of agencies that create the budget for P.F. Harris's advertising and carry out its advertising strategy by, among other things, purchasing ad placements.[12]  Once again, PurposeBuilt does so though its own high-level corporate officers, including its marketing officers.[13]  Furthermore, PurposeBuilt hires, supervises, and approves the work of agencies that focus on "earned media and influencer[s]" to drive awareness for the P.F. Harris brand.[14]  And it

---

[7] *See* https://jobs.weekday.works/purposebuilt-brands-sr.-associate-brand-manager (last visited March 8, 2026).

[8] *See id.*

[9] *Compare* https://pfharris.com, *with* https://purposebuiltbrands.com/careers (last visited March 8, 2026).

[10]   *E.g.*,   https://lbbonline.com/news/PurposeBuilt-Brands-Awards-Hanson-Dodge-2-New-Assignments (demonstrating that PurposeBuilt recently engaged a marketing agency, Hanson Dodge, to complete "creative and strategic development" for the P.F. Harris brand under PurposeBuilt's supervision) (last visited March 8, 2026).

[11] https://reel360.com/article/purposebuilt-brands-expands-hanson-dodge-partnership (last visited March 8, 2026).

[12]   *E.g.*,   https://www.prnewswire.com/news-releases/purposebuilt-brands-expands-horizon-big-partnership-to-agency-of-record-unifying-national-and-retail-media-strategy-to-continue-driving-growth-302673183.html ("PurposeBuilt Brands, the home care products company behind market leading brands such as Weiman, Goo Gone, Green Gobbler, and Harris, has expanded its partnership with Horizon Big, elevating the agency to media planning and buying agency of record across its full eight-brand consumer portfolio.") (last visited March 8, 2026).

[13] *Id.*

[14] https://www.zapwater.com/zapwater-whats-new/purpose-built-brands ("PurposeBuilt Brands, a pioneer

does so through high-level PurposeBuilt officers.

28. Furthermore, PurposeBuilt and P.F. Harris jointly control the P.F. Harris website: https://pfharris.com. The website's "Terms and Conditions" list an "owner contact email" that belongs to PurposeBuilt.[15] They also say: "This Website is provided by: CC Holdings, Inc., 755 Tri State Parkway, Gurnee, IL 60031."[16] CC Holdings, Inc. is a wholly owned subsidiary of PurposeBuilt that has no officers or employees independent of PurposeBuilt—PurposeBuilt entirely controls all of its functions. And the 755 Tri State Parkway address is shared jointly by PurposeBuilt and P.F. Harris (and even CC Holdings, Inc.).[17]

29. The P.F. Harris website's "Privacy Policy" also lists an "owner contact email" belonging to PurposeBuilt.[18] And it lists the website's "Owner and Data Controller" as "CC Holdings, Inc., 755 Tri State Parkway, Gurnee, IL 60031."[19] Moreover, the P.F. Harris website's "Company Policies" link redirects to policies created by PurposeBuilt.[20] And the P.F. Harris website has a "PurposeBuilt Brands" section linking to several other pages on the PurposeBuilt

---

in crafting top-tier products for cleaning specialty surfaces, has selected Zapwater Communications as it's earned media and influencer agency of record. The partnership will focus on driving awareness, interest and conversions for four of PurposeBuilt's pillar brands: Weiman, 30 SECONDS, P.F. Harris, and Green Gobbler.") (last visited March 8, 2026).

[15] Navigating to https://pfharris.com and clicking on "Terms and Conditions" at the bottom redirects to this webpage: https://www.iubenda.com/terms-and-conditions/17778883. That webpage lists an "owner contact email" of "questions@weiman.com." *Id.* Weiman is the predecessor company to PurposeBuilt—the company changed its name from Weiman to PurposeBuilt in 2020. https://purposebuiltbrands.com/company (last visited March 5, 2026).

[16] https://www.iubenda.com/terms-and-conditions/17778883 (this page is a redirect from the "Terms and Conditions" link on the https://pfharris.com webpage) (last visited March 5, 2026).

[17] https://purposebuiltbrands.com/company (PurposeBuilt website listing 755 Tri State Parkway address as "our headquarters"); https://ecorp.sos.ga.gov/BusinessSearch (search Control Number 08005765, to see 755 Tri State Parkway address listed as principal office address for P.F. Harris); https://magicamerican.com (listing 755 Tri State Parkway as address for CC Holdings, Inc.).

[18] https://pfharris.com (click "Privacy Policy" at the bottom of the website, which redirects to this website: https://www.iubenda.com/privacy-policy/17778883) (last visited March 4, 2026).

[19] *Id.*

[20] On https://pfharris.com, clicking on "Company Policies" under "PF Harris" at the bottom redirects to this webpage: https://purposebuiltbrands.com/policies. That is a webpage on PurposeBuilt's website.

website, including PurposeBuilt's "Company Overview," "Our Brands," and "Sustainability" webpages.[21] Ultimately, P.F. Harris operates as a mere instrument of PurposeBuilt brands, which dominates and controls P.F. Harris, and this has been the case since September 2024.

### III.     JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 exclusive of interest and costs and there is diversity of citizenship between the parties.  Defendants have sold over 150,000 containers of the products at issue in this case in the United States,[22] and over 11,000 containers in the State of New York, during the limitation periods applicable to Plaintiffs' and the below-defined classes' claims.  Plaintiffs and members of the classes are entitled to recover the full cost, or a portion of the full cost, of each container that they purchased (which sell for varying prices depending on container size and distributor, but have an average purchase price paid by consumers of approximately $40 per container).  They are also entitled to recover statutory damages under the consumer protection statutes raised below for each container sale.

31.     This Court also has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(d).  This is a putative class action with more than 100 class members.  There is diversity of citizenship among the parties.  And the amount in controversy is more than $5,000,000, exclusive of interest and costs.  Multiplying the number of at-issue container sales by the amount of purchase-price damages and statutory damages sought in this case yields a total damages amount exceeding the $5,000,000 benchmark.

---

[21] https://pfharris.com (see links at bottom under "PURPOSEBUILT BRANDS").
[22] For clarity, those products are Defendants' ice-melting products that are composed entirely of MCL. Most of those products are called "Safe Melt" and are labelled "Pet Safe."  Some of them are called "Kind Melt" and are labelled "Pet Friendly."

32. Defendants are also subject to this Court's general personal jurisdiction. It "is well-settled that a corporation is subject to the general personal jurisdiction of the state in which its principal place of business is located." *Shenzhen Aji Fashion Tech. Co. v. WhaleCo Inc.*, No. 23-cv-14043, 2024 WL 2845974, at *4 (N.D. Ill. June 5, 2024). And as discussed above, Illinois is the principal place of business for both Defendants.

33. Lastly, venue in this Court is proper for multiple reasons. It is proper under 28 U.S.C. § 1391(b)(1), because Defendants reside in this judicial district (in Gurnee, Illinois). Venue is also proper in this Court under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this lawsuit occurred in this judicial district (namely, Defendants made the marketing and sales decisions at issue in this suit from Gurnee, Illinois). Finally, venue is proper in this Court under 28 U.S.C. § 1391(b)(3), because Defendants are subject to the Court's personal jurisdiction with respect to this lawsuit.

## IV. FACTUAL ALLEGATIONS

### A. Consumers pay premiums for pet-safe and pet-friendly products.

34. "Pet owners often say that pets are important members of their families."[23] As a result, according to the U.S. government, the pet industry has become "big business."[24] Americans spend over $100 billion every year on their pets.[25]

35. Some of this money goes to food and supplements aimed at promoting pets' health. Reports show that 53% of dog owners buy vitamins or supplements for their pets, and 34% of cat owners do the same.[26] They also show that 43% of pet-owners give "more priority" to "buying

---

[23] https://www.bls.gov/opub/btn/volume-12/we-love-our-pets-and-our-spending-proves-it-1.htm (last visited March 8, 2026).
[24] *Id.*
[25] *Id.*
[26] https://americanpetproducts.org/news/the-american-pet-products-association-appa-releases-2025-dog-cat-report (last visited March 8, 2026).

healthy food for their pets *compared with themselves*."[27]  Relatedly, 41% of dog owners, and 38% of cat owners, purchase "premium" pet food to promote their pets' health.[28]

36.     Beyond food and supplements, many consumers buy toys for their pets.  Before doing so, 71% of consumers "look into the safety of pet toys before buying."[29]  And as "a safety precaution," "pet owners avoid specific materials when buying pet toys."[30]  For instance, for chewy toys, 53% of consumers avoid "rawhide bones" and 43% avoid "marrow bones"[31] because those types of bones are considered potentially dangerous for pets.

37.     Consumers also care about pet safety when shopping for ice-melting salts.  Pets commonly walk over those products, roll around on them, lick them off the ground, eat snow treated with the products, or lap up liquid or slush including the products.  Curious pets with exposure to the products, such via an open container or a pile of the product accumulated on the ground, will also directly eat the products.  Accordingly, reports demonstrate that consumers "are increasingly preferring ice melts that are less harmful to . . . pets."[32]  And the ice-melting "industry is trending towards pet-safe . . . formulations.[33]

38.     Because consumers prefer ice-melting products that are safe for their pets, companies are able to charge substantial premiums for allegedly pet-safe salts.  Products made by Morton Salt, Inc. ("Morton") are illustrative.  Regular Morton-brand ice-melting salts—which are sold without any "pet safe" representations—sell for $0.28 per pound.[34]  Yet Morton's "Safe-T-

---

[27] https://pmc.ncbi.nlm.nih.gov/articles/PMC6515811 (emphasis added) (last visited March 8, 2026).
[28]    https://americanpetproducts.org/news/the-american-pet-products-association-appa-releases-2025-dog-cat-report (last visited March 8, 2026).
[29] https://globalpetindustry.com/article/new-data-unpacks-consumer-habits-in-pet-toys (last visited March 8, 2026).
[30] *Id.*
[31] *Id.*
[32] https://www.cognitivemarketresearch.com/ice-melt-products-market-report (last visited March 8, 2026).
[33] *Id.*
[34] https://www.acmemarkets.com (search for Morton ice-melting products) (last visited March 7, 2026).

Pet" ice-melting salts, which are advertised as "Safe for Pets" and "Veterinarian Recommended," sell for $1.50 per pound.[35] Put differently, Morton's "pet safe" product sells at an astonishing *425%* premium over its regular product. Again: consumers care deeply about their pets' safety.

**B.     Defendants market and label their ice-melting salts as "Pet Safe."**

39.     P.F. Harris markets its ice-melting salts to appeal to these consumers. It labels Safe Melt as "Pet Safe" in a large red graphic visible on the front of every container.[36] The graphic is shown in the below image:



40.     P.F. Harris sometimes sells the very same ice-melting salt, made of the very same ingredients, in a different container. The container calls the product "Kind Melt." P.F. Harris includes a large red "Pet Friendly" graphic on the front of every Kind Melt container. The graphic is shown in the image below:

---

[35] *Id.*

[36] https://pfharris.com/harris-polar-melt-safe-melt (last visited March 8, 2026).



41.     P.F. Harris has used the same language and graphics on the containers for Safe Melt and Kind Melt, including the above "Pet Safe" and "Pet Friendly" labels, continuously since February 2023.[37]  This means all customers who purchased those products in physical retail locations were exposed to the above language and graphics, pre-purchase, during that time-frame.

42.     That language, and those graphics, have also been visible on all online product sales pages for Safe Melt and Kind Melt since February 2023, whether the product pages have appeared on P.F. Harris's website or on third-party websites like Amazon and Home Depot.

43.     Those product sales pages have all included images of the front of the Safe Melt and Kind Melt containers since February 2023.  Those sales pages also have included independent language describing both Safe Melt and Kind Melt as "Pet Safe."

---

[37] https://web.archive.org/web/20230205141147/https://pfharris.com/collections/ice (web archive showing Safe Melt's container graphics from February 2023).

**C.      Defendants' ice-melting salts are not, in fact, safe for pets.**

44.      Unfortunately, Safe Melt and Kind Melt are neither "Pet Safe" nor "Pet Friendly," as their containers claim.  Both Safe Melt and Kind Melt are made entirely of MCL.  And ice-melting salts made of MCL are "highly toxic to dogs" and other pets "if ingested."[38]

45.      Ingestion can cause a range of symptoms.  They include "vomiting and diarrhea, sometimes severe enough to cause dehydration or even tremors and seizures, depending on amount ingested and size of the pet."[39]  Consuming MCL ice-melters can also cause "hypotension, respiratory depression, impaired neuromuscular transmission, and cardiac abnormalities" in pets.[40] And other ingestion symptoms include "irritati[on] to the gastrointestinal tract," "bloody vomiting,"[41] and "kidney failure."[42]

46.      Notably, pets can suffer many of these symptoms—including serious ones like "vomiting" and "tremors"—even if they consume only a "small amount" of an MCL ice-melter.[43] This may occur if a pet simply "licks their paws after a winter walk" over an ice-melting product.[44] Indeed, "[p]ets licking their feet after walking through an area treated with ice melt" causes the "most calls" regarding ice-melters to an animal poison control center.[45]  And "pets licking the ground where ice melt was used" is also a common concern.[46]

---

[38] www.petmd.com/dog/general-health/things-to-know-about-pet-safe-ice-melts (last visited March 8, 2026).

[39] https://vetmed.illinois.edu/pet-health-columns/winter-safety-for-dogs (last visited March 8, 2026).

[40] www.aspcapro.org/sites/default/files/zg-vettech_0202.pdf.   Furthermore, "overdoses may result in disruption of neuromuscular activity and cardiac arrest."   www.aspcapro.org/sites/default/files/zg-vettech_0202.pdf.

[41] www.aspca.org/news/it-safe-use-de-icers-around-your-dog (last visited March 8, 2026).

[42] https://www.whole-dog-journal.com/care/pet-friendly-ice-melt (last visited March 8, 2026).

[43] www.veg.com/post/the-danger-of-ice-melt-and-salts-for-dogs (last visited March 8, 2026).

[44] *Id.*

[45] www.aspcapro.org/resource/ice-melt-toxicity-pets (last visited March 8, 2026).

[46] *Id.*

47. Aside from the ingestion risks of MCL ice-melting products, those products are dangerous for pets to touch. Direct contact can cause chemical burns, as well as serious cracking and bleeding on paw pads.[47] It can also cause painful skin irritation and redness.[48]

48. As a result of MCL ice-melters' and other ice-melters' inherent risks to pets, veterinary care professionals advise pet owners to "rinse [their pets'] paws immediately with warm (not hot) water" if their "pet walks on ice melt."[49] And they tell pet owners to "[c]all an ER for pets immediately if [they] suspect/observe ingestion" of an ice-melting product.[50]

49. Even though consumption of Safe Melt and Kind Melt can seriously harm pets, the containers and sales webpages for those products have never warned consumers that the products are unsafe for pets to ingest.

50. Likewise, the containers and sales webpages for those products have never warned about the most serious symptoms pets can experience due to direct contact with the products. The products' containers do contain a "Warning: May Cause Eye & Skin Irritation" statement. But that appears to be meant for humans, not pets, because it appears under a "Keep Out of the Reach of Children" statement, without any similar warning for pets.

51. Moreover, the "Eye & Skin Irritation" statement leaves serious contact-based side effects out. Pets are not simply at risk of skin "irritation." As discussed, Safe Melt and Kind Melt can cause chemical burns, paw cracking, and bleeding.

52. Safe Melt's and Kind Melt's containers have never contained warnings about these symptoms. Nor have they provided instructions for owners to help pets avoid these symptoms.

---

[47] www.veg.com/post/the-danger-of-ice-melt-and-salts-for-dogs; https://thehoundhq.com/ice-melt-and-your-pups-paws-what-omaha-owners-need-to-know (last visited March 8, 2026).
[48] www.veg.com/post/the-danger-of-ice-melt-and-salts-for-dogs (last visited March 8, 2026).
[49] *Id.*
[50] *Id.*

53. The bottom line is that, based on Safe Melt's and Kind Melt's 100% magnesium chloride composition, the products are unsafe for pets.

**D. The "Pet Safe" labels on Defendants' ice-melting salts are misleading to reasonable consumers.**

54. As a result, the "Pet Safe" and "Pet Friendly" ads on Safe Melt's and Kind Melt's containers and sales webpages mislead reasonable consumers. The sole basis for these claims appears to be that the products are formed into "pelleted balls instead of jagged crystals" to prevent pets from cutting their paws when walking across the products.[51]

55. But that is not the primary, or most common, manner in which consumers interpret the terms "Pet Safe" or "Pet Friendly." According to a 500-person "check all that apply" survey, 79% of consumers think that marketing an ice-melting product as "Pet Safe" means the "product will not harm a pet that licks or ingests it." And 69% also think a "Pet Safe" product "will not harm a pet's skin or eyes upon contact."

56. A similar 500-person "check all that apply" survey regarding "Pet Friendly" labels shows similar results. It shows that 84% of consumers think that marketing an ice-melting product as "Pet Friendly" means the "product will not harm a pet that licks or ingests it." And 71% also think a "Pet Friendly" product "will not harm a pet's skin or eyes upon contact."

**E. Defendants know that the "Pet Safe" labels on their ice-melting salts are deceptive and inaccurate.**

57. P.F. Harris has been well-aware that Safe Melt and Kind Melt are not "Pet Safe" or "Pet Friendly" since September 2019.

58. In September 2019, P.F. Harris created a Safety Data Sheet ("SDS") for Safe Melt. Ex. 2 (Safe Melt Safety Data Sheet). An SDS is an informational sheet that producers of certain

---

[51] https://pfharris.com/harris-polar-melt-safe-melt (last visited March 8, 2026).

types of products issue to their employees to describe "hazards and appropriate protective measures [for] employees," in compliance with regulations promulgated by the Occupational Safety and Health Administration ("OSHA").[52]

59.     The SDS for Safe Melt stated: "This material is considered hazardous by the OSHA Hazard Communication Standard (29 CFR 1910.1200)." Ex. 2. It also listed a series of health problems that touching or ingesting Safe Melt can cause. *Id.*

60.     Before issuing this SDS, P.F. Harris conducted research into the impacts that Safe Melt can have on both humans and animals. This research apprised P.F. Harris of the negative health impacts that Safe Melt can have on animals. And even though P.F. Harris has always *omitted* the following from Safe Melt's and Kind Melt's containers, which consumers see, the SDS for Safe Melt included the following warning for P.F. Harris employees: "Store only in original container, in a dry place inaccessible to children ***and pets***."[53] Ex. 2 (emphasis added).

61.     PurposeBuilt subsequently became aware of the health hazards Safe Melt and Kind Melt can cause people and animals around September 2024. The standard due diligence involved in purchasing a company that manufactures or sells chemical products includes a review of regulatory compliance and safety materials, including Safety Data Sheets, product labels, hazard classifications, and associated information. PurposeBuilt conducted extensive due diligence into P.F. Harris's products, including Safe Melt and Kind Melt, pre-acquisition.

**F.     Defendants have sold their products at an unearned price premium based on Defendants' misrepresentations.**

62.     Although the "Pet Safe" and "Pet Friendly" labels are inaccurate, Defendants have sold Safe Melt and Kind Melt to consumers at a price premium based on those inaccurate labels.

---

[52] 29 C.F.R. § 1910.1200.

[53] For clarity: P.F. Harris has included the statement regarding children on its products' containers, but has always omitted the part referring to pets from those containers.

- 17 -

And Defendants are both responsible for the unearned price premium paid by Plaintiffs.

63. From February 2023 until the time that PurposeBuilt acquired P.F. Harris, P.F. Harris manufactured Safe Melt and Kind Melt, advertised those products, created the language and graphics included on those products' containers, wrote and published the information on the products' sales webpages, and sold the products directly to consumers off of its website.

64. P.F. Harris also created relationships with third-party distributors who sold Safe Melt and Kind Melt to consumers on their online platforms, to consumers in their physical stores, or to other retailers.

65. These merchants included companies popular with consumers, like Amazon, Home Depot, and Wal-Mart, among many others. P.F. Harris provided the information and graphics for Safe Melt and Kind Melt that appeared on those products' sales pages on third-party merchants' online platforms.

66. P.F. Harris also set the direct-to-consumer price for Safe Melt and Kind Melt (for products sold directly off of the P.F. Harris website) and it set the wholesale price for Safe Melt and Kind Melt that it provided to other distributors.

67. Notably, during this time-frame, P.F. Harris sold an ice-melting salt called "Swift Melt," which it did not market as being pet-safe or pet-friendly.

68. And while selling Safe Melt, Kind Melt, and Swift Melt at the same time, P.F. Harris set the price of 15-pound containers of Swift Melt significantly below the prices for 15-pound containers of the other products.

69. Specifically: for containers sold directly to consumers off of P.F. Harris's website, P.F. Harris sold Swift Melt for $35.99 and sold Safe Melt and Kind Melt for $39.99.[54]

---

[54] https://web.archive.org/web/20230528204815/https://pfharris.com/collections/ice (May 2023 archive

70. That means P.F. Harris sold its "Pet Safe" and "Pet Friendly" ice-melters at a 10% premium over its regular ice-melting product.

71. P.F. Harris also set the price of Safe Melt and Kind Melt at a premium when sold in other locations and on other websites.

72. And the increased demand for Safe Melt and Kind Melt generated by their "Pet Safe" and "Pet Friendly" labels permitted P.F. Harris and other retailers to sell those products at a price premium over other companies' regular ice-melting products as well.

73. PurposeBuilt continued all these practices after acquiring P.F. Harris in September 2024.

74. Since that time, PurposeBuilt has supervised and directed P.F. Harris's manufacturing of Safe Melt and Kind Melt.

75. It has also jointly run the advertising campaigns for those products. And PurposeBuilt has approved the language and graphics included on those products' containers and sales webpages, whether for products sold in physical locations, on the P.F. Harris website, or on third-party merchants' websites.

76. PurposeBuilt has also worked to develop relationships with merchants to ensure Safe Melt and Kind Melt maintain their market share and are sold in an increasing number of locations. PurposeBuilt has also, jointly with P.F. Harris, set the retail price and wholesale price charged for Safe Melt and Kind Melt, and it has set and approved those prices at premiums over other ice-melting products.

77. For instance, PurposeBuilt reviewed and approved the pricing for Swift Melt, Safe Melt, and Kind Melt. And PurposeBuilt and P.F. Harris have jointly sold Swift Melt for $35.99

_____

showing 15 pound bag of Swift Melt being sold for $35.99 whereas 15 pound bags of Safe Melt and Kind Melt were being sold for $39.99).

and sold Safe Melt and Kind Melt for $39.99 directly to consumers off of the P.F. Harris website.[55] That, again, means PurposeBuilt and P.F. Harris sold their "Pet Safe" and "Pet Friendly" products at a 10% premium over their regular ice-melting salt.

78.     PurposeBuilt and P.F. Harris also, post-acquisition, jointly set the price of Safe Melt and Kind Melt at a premium when sold in other locations and on other websites.

79.     And the increased demand for Safe Melt and Kind Melt generated by their "Pet Safe" and "Pet Friendly" labels permitted PurposeBuilt and P.F. Harris (and other retailers) to sell those products at a price premium over other companies' regular ice-melting products as well, ever since PurposeBuilt acquired P.F. Harris.

## V.     CLASS ACTION ALLEGATIONS

80.     Plaintiffs seek to represent a class (the "Nationwide Class") of all individuals who, in the United States of America, purchased Safe Melt or Kind Melt at any time within the limitation periods applicable to the below-defined claims of the Nationwide Class.  Plaintiffs also seek to represent a class (the "New York Class") of all individuals who, in the United States of America, purchased Safe Melt or Kind Melt at any time within the limitation periods applicable to the below-defined claims of the New York Class.  The Nationwide Class and the New York Class are referred to below as the "Classes."

81.     The Classes meet the certification prerequisites of Federal Rule of Civil Procedure 23(a).

82.     The Classes' members are too numerous for practicable joinder, given that Defendants have sold over 150,000 containers of the products at issue in this case in the United States, and over 11,000 containers in the State of New York, during the limitation periods

---

[55] https://web.archive.org/web/20250114030248/https://pfharris.com/collections/ice (same, from January 2025).

applicable to Plaintiffs' and the Classes' claims.

83.     There are also questions of law and fact common to the Classes.  These include whether Safe Melt and Kind Melt can cause health problems for pets that ingest it; whether statements on Safe Melt's and Kind Melt's containers are misleading to reasonable consumers; whether those statements are material to reasonable consumers; and whether those statements caused a price premium charged to all members of the Classes.

84.     Plaintiffs' claims are typical of the Classes' claims because they arise from the same uniform misrepresentations and omissions on Safe Melt's and Kind Melt's containers, and they depend on the same legal theories.

85.     Further, Plaintiffs and their counsel are adequate representatives of the Classes. Plaintiffs have suffered the same injury as members of the Classes they seek to represent (they purchased a product at a price artificially inflated by Defendants' misrepresentations and omissions); Plaintiffs have no conflicts of interest with members of the Classes they seek to represent; and Plaintiffs' counsel is highly experienced in class action litigation, including consumer class action litigation.

86.     The Classes also meet the certification requirements of Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted on grounds that apply generally to the Classes, making final declaratory or injunctive relief appropriate respecting the Classes as a whole. Injunctive relief is appropriate in this case because, without it, Plaintiffs will be unable to rely on Safe Melt's and Kind Melt's labels when making purchasing decisions in the future and Defendants' false and misleading advertising threatens Plaintiffs' right to receive truthful information from Defendants about their products.  Plaintiffs and members of the Classes would willingly purchase ice-melting products in the future if the products were, in fact, "Pet Safe" and

"Pet Friendly."

87.     Finally, the Classes meet the certification prerequisites of Federal Rule of Civil Procedure 23(b)(3).

88.     Questions of law and fact common to the Classes' members predominate over any questions affecting only individual members.  The most important question in this case is whether calling an MCL-based ice-melting product "Pet Safe" or "Pet Friendly" is misleading to reasonable consumers.  That question can be proven by class-wide evidence, and it predominates over questions requiring individualized determinations.

89.     Another important, common matter concerns damages.  Defendants were able to sell more MCL-based ice-melting products than they would have otherwise been able to sell due to the misrepresentations and omissions they made on those products' containers and sales webpages.  Consumers relied upon Defendants' statement on Safe Melt's and Kind Melt's packaging that the products are "Pet Safe" and "Pet Friendly" and many would not have purchased the product but for those statements.  Relatedly, due to Defendants' misrepresentations and omissions, Defendants sold Safe Melt and Kind Melt at prices higher than they otherwise would have been able to sell them (at all times within the applicable limitations periods and, specifically, at the times that Plaintiffs purchased Safe Melt).  The difference between the price at which Defendants were able to sell their MCL ice-melting products, and the price at which they could have sold them absent the misrepresentations and omissions, is the primary injury suffered by Plaintiffs and members of the Classes (put differently: this is the difference between the actual value of the products Plaintiffs and members of the Classes purchased and the inflated price that they paid).  That injury can be measured using a uniform method that can be applied across the Classes.

90. A class action is also superior to other available methods for adjudicating this controversy. It will promote fairness, justice, and efficiency, as well as reduce litigation costs and duplicative litigation stemming from the many Safe Melt and Kind Melt sales that Defendants have made in New York and nationwide. The expert analysis and testimony that will be required to measure the price premium stemming from Defendants' misrepresentations and omissions will be expensive and will prevent individual members of the Classes from pursuing their claims outside of the class action context. For this, and many other reasons, the use of the class action device is preferrable to individual litigation in this case.

## VI.    CAUSES OF ACTION

91. Plaintiffs seek the following relief based on the following causes of action.

### First Cause of Action
### Violation of Section 349 of the New York General Business Law
### (Brought by Plaintiffs on Behalf of the New York Class)

92. Plaintiffs incorporate by reference and reallege here all foregoing paragraphs of this Complaint.

93. Section 349 of the New York General Business Law ("Section 349") bars "[d]eceptive acts or practices in the conduct of . . . business, trade or commerce." N.Y. Gen. Bus. Law § 349.

94. Defendants violated Section 349. They labelled Safe Melt as "Pet Safe" and Kind Melt as "Pet Friendly." Those statements were not true. And they were also misleading based on what they omitted. Defendants failed to state, on Safe Melt's and Kind Melt's containers and sales webpages, that Safe Melt and Kind Melt can cause health problems for pets that ingest the products. And Defendants failed to mention the most serious health problems that can occur when pets touch the products.

95. Defendants' misrepresentations and omissions caused injury to Plaintiffs and the New York Class. Those misrepresentations and omissions artificially boosted the demand for Safe Melt and Kind Melt, thereby permitting Defendants to sell the products at artificially inflated prices. This heightened price was charged both to those who saw and relied on Defendants' misrepresentations and omissions and those who did not. Thus, Plaintiffs and the New York Class suffered injury in the form of a price premium.

96. Defendants intended for consumers, including Plaintiffs and members of the New York Class, to rely on their misrepresentations and omissions so that they would purchase Safe Melt and/or Kind Melt and do so at a price premium. Defendants also made their misrepresentations and omissions knowingly. They knew or should have known that Safe Melt and Kind Melt are not "Pet Safe" or "Pet Friendly." And they preemptively set the prices for those products higher than they otherwise would have based on their knowledge that consumers highly prefer pet-safe and pet-friendly products.

97. As a result, Plaintiffs and members of the New York Class each seek and are entitled to: (a) actual damages or $50, whichever is greater, for each of Defendants' violations; (b) three times actual damages up to $1,000 for each of Defendants' willful or knowing violations; (c) reasonable attorney's fees and costs; (d) injunctive relief; and (e) any other relief the Court deems proper. N.Y. Gen. Bus. Law § 349(h).

**Second Cause of Action**
**Violation of Section 350 of the New York General Business Law**
**(Brought by the New York Plaintiffs on Behalf of the New York Class)**

98. Plaintiffs incorporate by reference and reallege here all foregoing paragraphs of this Complaint.

99. Section 350 of the New York General Business Law ("Section 350") declares "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York "unlawful." N.Y. Gen. Bus. Law § 350. "The term 'false advertising' means advertising, including labeling . . . if such advertising is misleading in a material respect." *Id.* § 350-a. "In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations." *Id.*

100. Defendants violated Section 350. They labelled Safe Melt as "Pet Safe" and Kind Melt as "Pet Friendly." Those statements were not true. And they were also misleading based on what they omitted. Defendants failed to state, on Safe Melt's and Kind Melt's containers and sales webpages, that Safe Melt and Kind Melt can cause health problems for pets that ingest the products. And Defendants failed to mention the most serious health problems that can occur when pets touch the products.

101. Defendants' misrepresentations and omissions caused injury to Plaintiffs and the New York Class. Those misrepresentations and omissions artificially boosted the demand for Safe Melt and Kind Melt, thereby permitting Defendants to sell the products at artificially inflated prices. This heightened price was charged both to those who saw and relied on Defendants' misrepresentations and omissions and those who did not. Thus, Plaintiffs and the New York Class suffered injury in the form of a price premium.

102. Defendants intended for consumers, including Plaintiffs and members of the New York Class, to rely on their misrepresentations and omissions so that they would purchase Safe Melt and/or Kind Melt and do so at a price premium. Defendants also made their

misrepresentations and omissions knowingly. They knew or should have known that Safe Melt and Kind Melt are not "Pet Safe" or "Pet Friendly." And they preemptively set the prices for those products higher than they otherwise would have based on their knowledge that consumers highly prefer pet-safe and pet-friendly products.

103. As a result, Plaintiffs and members of the New York Class each seek and are entitled to: (a) actual damages or $500, whichever is greater, for each of Defendants' violations; (b) three times actual damages up to $10,000 for each of Defendants' willful or knowing violations; (c) reasonable attorney's fees and costs; (d) injunctive relief; and (e) any other relief the Court deems proper. N.Y. Gen. Bus. Law § 350-e(3).

**Third Cause of Action**
**Unjust Enrichment**
**(Brought by Plaintiffs on Behalf of the**
**Nationwide Class and the New York Class)**

104. Plaintiffs incorporate by reference and reallege here all foregoing paragraphs of this Complaint.

105. A cause of action for unjust enrichment is viable where a defendant has received and unjustly retained a benefit at the expense of another.

106. Defendants have received benefits from Plaintiffs and the Classes stemming from Defendants' misrepresentations and omissions regarding Safe Melt and Kind Melt. Defendants have sold more of those products than they would have sold absent those misrepresentations and omissions, given that many consumers would not have purchased those products but for those misrepresentations and omissions. Defendants have also sold the products at higher prices than they could have charged absent their misrepresentations and omissions, due to the artificially inflated demand for the products that Defendants' misrepresentations and omissions created, and due to Defendants' perception that they could set the prices for the products higher due to

- 26 -

Defendants' misrepresentations and omissions based on Defendants' market research. Thus, Defendants have received a benefit in the form of unearned profits and revenue from Plaintiffs and members of the Classes.

107. Defendants' enrichment has been to Plaintiffs' and the Classes' detriment. In purchasing Safe Melt and/or Kind Melt, members of the Classes relied on Defendants' statements that the products were "Pet Safe" or "Pet Friendly," and they would not have purchased the products but for those statements. Certainly, they would not have purchased the products at the price premium attributable to Defendants' misrepresentations and omissions. Therefore, Plaintiffs and members of the Classes have been harmed economically in that they paid for products they would not have bought or paid higher prices for products than they would have paid but for Defendants' misconduct.

108. It would be unjust for Defendants to retain their unearned profits at the expense of Plaintiffs and members of the Classes. Defendants' misrepresentations and omissions were knowingly deceptive. And it would violate fundamental principles of justice, equity, and good conscience to permit Defendants to retain the benefits of their knowing misrepresentations and omissions at the expense of Plaintiffs and members of the Classes.

109. As a result, Plaintiffs and members of the Classes each seek and are entitled to restitution, disgorgement, injunctive relief, and any other relief the Court deems proper.

## **PRAYER FOR RELIEF AND DEMAND FOR JURY TRIAL**

WHEREFORE, Plaintiffs, individually and on behalf of all similarly situated persons, demand a jury trial for all claims so triable and respectfully request that the Court grant the following relief:

A. Certification of this case as a class action pursuant to Federal Rule of Civil Procedure 23;

B.       Designation of Plaintiffs as class representatives of the above-defined Classes and designation of counsel of record as Class Counsel for the Classes;

C.       A declaratory judgment that the practices complained of herein are unlawful and appropriate injunctive relief addressing those practices;

D.       An award of actual damages, statutory damages, punitive damages, restitution, and other relief provided for under the foregoing causes of action as set forth above;

E.       An award of attorney's fees and costs incurred in this action, including expert fees;

F.       Pre-judgment and post-judgment interest, as provided by law;

G.       Reasonable service awards for Plaintiffs; and

H.       All other legal and equitable relief that this Court deems necessary, just, or proper.

Dated: March 13, 2026                                    Respectfully submitted,

                                                          */s/ John J. Frawley*
                                                          **One of Plaintiffs' Attorneys**

                                                          Douglas M. Werman
                                                          John J. Frawley
                                                          **WERMAN SALAS P.C.**
                                                          dwerman@flsalaw.com
                                                          jfrawley@flsalaw.com
                                                          77 W. Washington St., Suite 1402
                                                          Chicago, Illinois 60602
                                                          Phone No.: (312) 419-1008

                                                          *Attorneys for Plaintiffs and the Putative Classes*